## PHILIP BLUM AND SAMUEL BLUM *vs.* THE STATE OF MARYLAND.

*Sufficiency of Indictment for Conspiracy to Defraud—Constitutional Law—Party Indicted for Fraud Cannot Be Compelled to Produce His Books in Evidence Against Himself—Competency of Evidence to Show Conspiracy to Defraud—Summary of Documentary Evidence.*

An indictment charged that the defendants did unlawfully conspire and agree together by means of divers false pretenses and representations, and subtle means and devices to obtain goods and chattels of certain named persons and others and to cheat and defraud such persons, etc. *Held*, that this indictment is sufficient in law, and it is not necessary to specify the particular means by which the fraud was perpetrated.

The constitutional provision that no man ought to be compelled to give evidence against himself in a criminal case, operates to prohibit the prosecution from compelling a man to produce in evidence his private books and papers for the purpose of establishing a criminal charge against him.

The traversers, who had been partners in carrying on a business, were indicted for a conspiracy to defraud their creditors. Previously thereto receivers for the firm had been appointed by an equity Court, who took possession of the partnership books and papers. *Held*, that upon the trial of the indictment these books and papers are not admissible in evidence against the objection of the traversers, because under the Con-

stitution no man can be compelled to give evidence against himself in a criminal case, and the books were not voluntarily given to the receivers, but were taken possession of under an order of Court, and the appointment of receivers did not contemplate a criminal prosecution.

Upon an indictment for conspiracy to defraud, the evidence showed that the defendants were partners in business ; that the mother and sister of two of them and the wife of the bookkeeper of the firm kept shops in different parts of the city for the sale of goods ; that shortly before its failure the firm bought a quantity of goods on credit and that a large part thereof was carried away from the firm's store before the appointment of the receivers. *Held,* that evidence is admissible to show that these goods were taken to the shops kept by the women relatives of the defendants, and were there offered for sale in some instances at a price below cost, since it is pertinent to ascertain whether the goods removed from defendants' store were sold in good faith or were merely moved to other stores controlled by them, or sold at nominal prices, in pursuance of the fraud charged.

Upon the trial of this indictment all the papers in the equity case relating to the appointment of receivers and the claims of creditors filed therein were admitted in evidence without objection. *Held,* that a witness, who was counsel for the receivers, may testify that a paper produced in evidence is a correct summary of the claims proved in the equity case, as tending to establish the amount of the indebtedness thereby indicated.

Where partners have been indicted for conspiracy to defraud their creditors, a statement made by a partner to a mercantile agency concerning the firm's financial condition is not admissible in evidence for the prosecution without proof that the statement was made with intent to use the mercantile agency as an instrument in perpetrating the fraud charged.

When the fact offered to be proved is the general result, reached by calculation, of numerous documents already in evidence, a witness who has examined them may state the result of such examination.

Appeal from the Criminal Court of Baltimore, (WICKES, J.)

The cause was argued before MCSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE and SCHMUCKER, JJ.

*Wm. Pinkney Whyte* and *Martin Lehmayer,* (with whom was *Wm. Colton* on the brief), for the appellants.

*Edgar Allan Poe,* (with whom were *Isidor Rayner, Attorney-General,* and *Robert M. McLane, State's Attorney,* on the brief), for the appellee.

PEARCE, J., delivered the opinion of the Court.

The appellants, together with one Isaac Harris, were indicted in the Criminal Court of Baltimore City for conspiring "by means of divers false pretences and representations, and other false and subtle means and devices to obtain and acquire unto themselves certain properties, moneys, goods and chattels," of certain corporations and persons named in the indictment, and of certain other persons to the jurors unknown, of the value of $2,500, and to cheat and defraud such persons and corporations. A bill of particulars as to Samuel Blum was demanded and filed. The traversers pleaded "not guilty," and the case was tried before the Court, resulting in a verdict of acquittal in favor of Harris, and of conviction against the two appellants, who were sentenced to confinement in jail for twenty months.

Seven exceptions taken by the traversers to the admissibility of evidence offered by the State are brought up for review by this appeal.

Philip and Samuel Blum entered into partnership as wholesale grocers in Baltimore, in 1894, as Blum Bros., continuing in business under that firm name until February 8th, 1900, when Isaac Harris was admitted as a partner, and the firm name was changed to Blum Bros. & Harris.

The following facts were agreed on at the trial. That the firm of Blum Bros. & Harris took out license for $1,000 May 1st, 1900, for 300 W. Lombard St. That Annie Blum, mother of Philip and Samuel Blum, took out license for $500 May 1st, 1900, for 212 Albemarle St. That Sarah Rosensweig, sister of Philip and Samuel Blum, took out two licenses, one May 1st, 1900, for $500, for 300 N. Pine St., and one December 1st, 1900, for $500, for 417 W. Saratoga St. That Wm. Harris, brother of Isaac Harris, took out license November 2nd, 1900, for $1,000, for 428 S. Paca St., and that Ida Block, wife of Isaac Block, the bookkeeper of Blum Bros. & Harris, took out license December 1st, 1900, for $500, for 815 Ashland Avenue. That the assets of Blum Bros. at the time Harris was taken in were $6,000, and their liabilities

$2,500, and that Harris put in $2,500 furnished by his wife, making the net assets of Blum Bros. & Harris $6,000. A number of witnesses were examined on each side and the record embraces a mass of testimony.

A large part of the able brief of the appellants, and of the oral argument of their distinguished senior counsel, was devoted to a criticism of the indictment, which it is contended does not set forth the offense with the clearness and certainty necessary to apprise the accused of the crime with which they stood charged, since the State contented itself with stating the offense in the same generic terms employed in the definition of the offense at common law, and failed to descend to such particulars as are necessary to inform the Court of the facts alleged, in order to determine whether they are sufficient in law to support a conviction, and to enable the accused to avail themselves either of an acquittal or a conviction in event of future prosecution upon the same charge.

If the indictment was thus insufficient and defective, the only course was to demur, as the learned counsel well knew. *Hawthorn* v. *State*, 56 Md. 533. But relying upon their contention that no legal proof of such allegations as were made in that indictment could be furnished, in the language of their brief, "they resorted to the plea of *not guilty*, depending upon the ruling of the Court for its own guidance, sitting as a jury, to save them from conviction upon insufficient and illegal proof." No demurrer having been interposed to the indictment, we would not be warranted in reviewing it here, but we deem it proper to say in order to avoid the creation of any doubt upon the question, that we regard the sufficiency of this indictment as established by the decision in *State* v. *Buchanan*, 5 H. & J. 317, where all the authorities were elaborately reviewed. No decisions in this State are more highly regarded than those rendered by CHIEF JUSTICE BUCHANAN, and we think his opinion in that case is sustained by the weight of authority. In 6 *Amer. and Eng. Ency. of Law*, 2nd edition, note, p. 587, it is said that the law there laid down has been doubted in a few isolated instances, but

that it has not been successfully assailed. It was denied in *State* v. *Rickey*, 9 N. J. L. 293, but this view was disapproved by CHIEF JUSTICE GREEN in *State* v. *Norton*, 23 N. J. L. 44, and by CHIEF JUSTICE BEASLEY in *State* v. *Donaldson*, 32 N. J. L. 151 ; the former saying that the great weight of authority, the adjudged cases no less than the most approved elementary writers, sustain the law declared in *State* v. *Buchanan*, and the same view is held by the Courts of Connecticut, Illinois, New York, Pennsylvania and North Carolina. The case of *U. S.* v. *Cruikshank*, 92 U. S. 542, is not, in our opinion, in conflict with this view, the prosecution there being under the statute of the United States known as the Enforcement Act, and the indictment failing to specify in any of the counts what right or privilege granted or secured by the Constitution or laws of the United States, the traversers had conspired to defeat.

The first exception was taken to the admission in evidence of the books of account of the traversers, and it should be observed that the offer of these books is the first step of the prosecution. The first witness sworn was G. W. S. Musgrave, a member of the bar, who testified that as counsel for Harris, on December 3rd, 1900, he filed a bill against the two Blums for the appointment of a receiver of the firm, that this proceeding was by consent, and that he and Mr. Sonnehill, counsel for the Blums, were appointed receivers ; that upon qualifying, he went to the store and took the key from the constable who was in charge under an attachment which had been issued, and opened the store and took possession of everything in the store including the books. Thereupon the State offered in evidence certain books, ledgers, sales books, cash book, and bill files purporting to be the books and files of Blum Bros. & Harris, and also a book purporting to be the ledger of Blum Bros. To this offer the traversers objected, whereupon the State's Attorney assured the Court that this would be followed up by proof of where the books had been since they came into possession of Musgrave, that no change had been made in them, and that they were the books

of Blum Bros. & Harris, though Musgrave admitted he did not know in whose handwriting the books were. The traversers renewed their objection to the introduction of the books in evidence, but the Court overruled the objection and admitted the books, which were subsequently made the basis of much of the important testimony for the State.

The principal and most serious ground of this exception is, that this ruling virtually compelled the traversers to furnish evidence against themselves, in violation of the 22nd Article of the Declaration of Rights of this State, and the fourth and fifth amendments to the Constitution of the United States. This objection, the State seeks to meet by saying that the books had been *voluntarily* turned over by the traversers to the receivers, and hence, if the books contained admissions, they could be used as any voluntary oral admission by the traversers could be used, and that as the proceeding for the appointment of receivers was by consent, it could not be likened to one instituted by a hostile party for the express purpose of compelling the traversers to produce their books to be used against them. No authority was produced to sustain this position, though, if correct in itself, it needs none.

But it is not correct to say that the books had been *voluntarily* turned over to the receivers *for the purpose for which they are now sought to be used.* If we should grant, for the sake of argument, all that may fairly be implied from the fact that the proceeding for receivers was by consent, the fact would remain that the books were surrendered under the order of the Court, and what is far more important, and indeed vital to the determinatton of the question, the further fact that it cannot for a moment be contended that the appointment of receivers contemplated any criminal proceeding against the traversers, and that they can therefore be held to have waived any constitutional privilege in their defense. The purpose of a receivership is the preservation and proper disposition of the subject of litigation. The receiver is not the representative of the State, nor even of the creditors, but the hand of the Court whose control is exerted for the benefit of

those ultimately found entitled to the subject of litigation, and not to aid the State in making out a case in a criminal prosecution. It cannot therefore be claimed that the order appointing receivers could give, or was designed to give, any such power over the books as is here claimed, or that it could operate to change a rule of evidence in the administration of the criminal law. The effect of the order, upon the admission of the books in this case, can have no other or greater effect than an express order directed to the traversers, if there were no receivership, commanding them to produce these books and papers to be used in evidence for the State. The first inquiry therefore we are required to make is whether the admission of these books and papers was a violation of any constitutional privilege of the traversers.

The maxim *nemo tenetur se ipsum accusare* is derived from the common law and was re-affirmed in *Magna Charta*, whence it was transferred in slightly varying form to the constitutions of the several States of our Union. In the Declaration of Rights embodied in the Constitution of Maryland of 1776, it appeared in this form : "That no man ought to be compelled to give evidence against himself, in a common Court of law, or in any other Court, *but in such cases as have been usually practiced* in this State, or may hereafter be directed by the Legislature" ; and it was unchanged in the Constitution of 1851. But in the Constitution of 1864, it was in these words: "That no man ought to be compelled to give evidence against himself;" and it so stands in the Constitution of 1867 now in force. In *Broadbent* v. *The State*, 7 Md. 416, decided under the Constitution of 1851, it was contended that the Act of 1847, which in certain cases required parties in proceedings against them for fines, to answer under oath any bill of discovery filed by the Lottery Commissioner, was unconstitutional. It was very properly held that the Legislature had the power to compel the party to give evidence against himself, but in so deciding, CHIEF JUSTICE LEGRAND used the following forcible language : "But although it is competent to the Legislature to alter the rules of evidence so as to compel

a party to give evidence against himself, it is nevertheless a power of such transcendent and overwhelming importance that a just regard for the liberties of the citizen should, at all times, induce the most cautious and jealous exercise of it by the Legislature ; and especially should Courts of Justice anxiously and narrowly watch it, and never, under any pretence whatever, extend it beyond the limits to which the strictest interpretation of the language of the Legislature confines it in the particular case." And the Constitutional Convention of 1864, whether impressed by this admonition, or by its own perception of the danger inseparable from the posession of this power by the Legislature, withdrew it from the Legislature altogether in criminal cases. If it was the duty of Courts anxiously and narrowly to watch and restrict the exercise by the Legislature of a conceded power, how much more imperative is the duty to watch their own course and avoid the unconscious exercise of a power which is denied alike to the Legislature and to the Courts !

We have not forgotten that the exact privilege we are now considering is that of refusing to *give* evidence against oneself, and that, speaking literally, this means a refusal to answer a question which may lead to conviction for crime, and that in most cases of that character this is the personal privilege of a witness on the stand, which must be claimed by him under oath, and cannot be claimed for him by counsel or by a party to the proceeding who desires to avoid the effect of his answer, and that it does not appear from the record in this case that the privilege was claimed under oath by any of the traversers ; but that rule we apprehend is only applicable in a collateral proceeding where the party is a witness only, and not in a criminal proceeding where he is the party charged and then on trial. Moreover, the Fourth and Fifth Amendments to the Constitution of the United States which are *in pari materia* with articles 26 and 22 of our Declaration of Rights, have been held in *Boyd* v. *U. S.*, 116 U. S. 616, to be intimately related to each other and to throw great light on each other. In that case the Court said : "The unreasonable

searches and seizures condemned in the Fourth Amendment
are almost always made for the purpose of compelling a man
to give evidence against himself, which in criminal cases is
condemned in the Fifth amendment; and compelling a man
in a criminal case to be a witness against himself, which is
condemned in the Fifth Amendment, throws light on the ques-
tion, what is an unreasonable search and seizure within the
meaning of the Fourth Amendment. And we have been un-
able to perceive that the seizure of a man's private books and
papers, to be used in evidence against him, is substantially dif-
ferent from compelling him to be a witness against himself. "

The earliest case to which we have been referred as pre-
cisely in point, and it would be difficult to find one more suc-
cinct and apposite, is *Rex* v. *Cornelius et al.*, 2 Strange, 1201.
This was an information for a misdemeanor in taking money
for granting licenses to alehouse keepers. "The prosecutor
applied for a rule to inspect the books of the corporation al-
leging the defendants were only justices as they were bailiffs,
but the Judges refused to grant it, *because it is in effect oblig-
ing a defendant indicted for a misdemeanor*, to furnish evidence
against himself."

In *Jackson* v. *Benson*, 1 Young & Jervis, 32, it was held
that a Court will restrain a plaintiff from the use of answers,
in a penal proceeding, which may tend to criminate the wit-
ness. That was a suit for tithes, in which interrogatories ten-
dered to witnesses for their examination, were demurred to on
the ground that their object was to establish the claim of the
plaintiff, and thereby subject the witnesses to the penalties of
law imposed on those not setting out their predial tithes as by
law required. The demurrers were overruled because they ob-
jected generally to the interrogatories while parts of them were
free from objection, but the Court was careful to make an
order that plaintiff should enter into a stipulation to make no
use of the answers for the purpose of enforcing the penalties
for not setting out tithes. The analogy of that case to the
present in requiring the Court to restrain the State or the re-
ceivers from using the books, possession of which had been

lawfully acquired by the receivers in a civil proceeding, to the prejudice of the traversers in a criminal proceeding against them, is too obvious to need enforcement.

So in *Roberts* v. *Allatt*, Moody & Malkin, 192, where interrogatories were put to a witness, as in *Jackson* v. *Benson, supra*, the witness was required to answer only because it was shown the time limited for proceeding for the penalty had passed. The three cases last cited sufficiently show the view and practice of the English Courts in relation to this question, though incidental reference will be made later to another English case, discussed by the Supreme Court of the United States in *Boyd* v. *United States*, 116 U. S. 616. This case arose under the revenue law of 1874, which authorized a United States Court, on motion of the government attorney, to require the defendant to produce in Court his private books, invoices and papers, or else the allegations of the government to be taken as confessed, and this requirement of the law was held unconstitutional. In delivering the opinion of the Court JUSTICE BRADLEY said : "It is our opinion that a compulsory production of a man's private papers, to establish a criminal charge against him, or to forfeit his property, is within the scope of the Fourth Amendment to the Constitution, in all cases in which a search and seizure would be, because it is a material ingredient, and effects the sole object and purpose of search and seizure." He then proceeded to consider what was an unreasonable search and seizure within the meaning of the Fourth Amendment, discriminating from the case then under consideration cases in which goods were stolen from owners entitled to possession, and those in which dutiable articles are concealed from inspection by the government, or goods and chattels are concealed to avoid execution or attachment. He also quoted largely from the celebrated judgment of LORD CAMDEN in *Entick* v. *Carrington*, 19 Howell's St. Tr. 1029, which he characterized as "a monument of English freedom," and the propositions of which he said, "it may be confidently asserted were in the minds of those who framed the Fourth Amendment to the Constitution and were consid-

ered sufficiently explanatory of what was meant by unreasonable searches and seizures." Quoting from LORD CAMDEN, he says : "Papers are the owner's goods and chattels. They are his dearest property ; and are so far from enduring a seizure that they will hardly bear inspection." That was a case of trespass for seizing and carrying away the party's papers under a warrant upon a charge of seditious libel, but JUSTICE BRADLEY said: "The principles laid down in this opinion reach farther than the concrete form of the case then before the Court; they apply to all invasions on the part of the government and its employees, of the privacies of life * * * *And any compulsory discovery, by extorting the party's oath, or compelling the production of his private books and papers to convict him of crime, or to forfeit his property is contrary to the principles of free government."* This case of *Boyd* v. *United States*, is reviewed and approved in *Counselman* v. *Hitchcock*, 142 U. S. 547, and we are content to rest our ruling on this exception upon the exposition of the law contained in these two cases. Those who may desire to examine further authorities will find the cases fully considered in a note to *Levy* v. *San Francisco*, 29 L. R. A. 811.

We think the learned Judge of the Criminal Court was in error in admitting these books and papers, for the reason stated.

Having determined that the books and papers which were admitted at the trial below can in no event be admitted over the objection of the traversers at a new trial, it is unnecessary to consider the other grounds urged in support of this exception.

The second and third exceptions can be considered together. J. Ross Myers, one of the receivers, engaged in the flour and grain commission business, and a witness for the State, testified that his firm sold Blum Bros. considerable goods in 1898 and 1899, and that from February, 1900, to December, 1900, they sold Blum Bros. & Harris about $2,400, principally Duluth Imperial flour, for which his firm was sole agent in Baltimore and that until the latter part of the dealing they paid their

bills promptly and that during the last five weeks they were in business they sold them 121 barrels of this flour. He was then asked, " Did you ever see any of this stuff at any of these four stores," referring to the two stores of Sarah Rosensweig, and the stores of Annie Blum, Ida Block and Wm. Harris to which he answered, yes. Here the traversers objected to this line of testimony, and the Court asked how it was proposed to follow the question up, to which the States Attorney replied, he had showed the relationship of the parties, and would show that quantities of goods were carted away from the traversers store by their drivers to these various stores and that while the custom of the drivers in making other deliveries was to get receipts, they were instructed not to get receipts from these stores. The traversers still objecting, their objection was overruled, and the witness was allowed to proceed upon that line. This constitutes the second exception. The witness was then asked, " Where did you see some of this flour you sold Blum Bros. & Harris, in what stores." This question was objected to and the objection was overruled and the traversers excepted to the ruling in permitting the question to be asked and answered, this being the third exception. These questions were substantially followed up as proposed, by proof that quantities of goods were carted away from the traversers store on December 1st, the Jewish Sabbath ; the pavement being piled with goods in barrels, boxes, and bags ; that three or four drays were engaged in this carting ; that one load was followed to the store of Annie Blum, which was closed, but the goods were received in the back yard by her, and that some of the Duluth Imperial flour was then seen in the store through the window, and about 30 bbls. were found in one of the Rosensweig stores, which it was claimed were bought from Blum Bros. & Harris. M. J. Fitzsimmons, of the Md. Biscuit Co., testified that he went, December 3d, to one of the Rosensweig stores, and also to the stores of Ida Block and Wm. Harris and at each place found some goods such as he had sold Blum Bros. & Harris, which he priced and found selling below cost. No proof was offered as to the

alleged instructions given the drivers.   We think these questions were relevant, as it was pertinent to ascertain whether the goods removed from the traversers' store were sold in good faith, or were merely moved to the other stores, or sold at nominal prices, in pursuance of the fraud charged.   The presumption of innocence of course attends this transaction, and must be overcome by positive testimony, but the weight of that evidence in connection with all the other evidence properly in the case was for the jury.   We perceive no error in these rulings.

The fourth and fifth exceptions are sufficiently similar to be considered together, though one distinction is to be observed. All the papers in the equity case for a receivership, including all the claims proved and filed therein by creditors for dividend, were put in evidence by the State without objection. Mr. Bernard Chancellor being then on the stand for the State, counsel for the State exhibited to him a paper, and said to the Court: "This paper is a summary of the claims proved in the equity case.   Mr. Chancellor went over them with Mr. Myers and he made it out.   I want to get his testimony as to the correctness of this."   The traversers objected, but the Court said if Mr. Chancellor could show the tabulation was correct, it was proper evidence.   The traversers still objected, but the Court permitted the question and answer, to which ruling the fourth exception was taken.   This mode of proof is recognized as proper where the originals consist of numerous papers which cannot be conveniently examined in Court, and the fact offered to be proved is the general result of the whole collection, provided such result can be reached by calculation.   1 *Greenleaf*, sec. 93; *Stephen's Digest of the Law of Evidence*, Art. 67, sec. 9.

But the traversers contend that these claims so proved and filed were only primary proof, and that full proof being demanded, "they ceased to be any evidence in the case."   This position we think would be correct if the claims had not already gone in as evidence without objection or demand for full proof, because claims so proved under our testamentary

system, adopted in equity, are primary proof only, and when full proof is demanded, cannot be offered at all. *Allender* v. *Trinity Church*, 3 Gill, 172. But here they had been offered generally *and admitted*, and we think the question to Mr. Chancellor, under the circumstances of that case, was properly allowed, *as tending* to establish the amount of indebtedness thereby indicated, though without further proof to sustain and demonstrate the fact, the degree of proof would fall far short of what any jury would demand as satisfactory in a criminal case.

The same paper was subsequently exhibited to Mr. Myers and substantially the same question was put to him and allowed, which constitutes the fifth exception. The distinction between this and the fourth exception is found in the comparison made by Mr. Myers in his answer of the amounts indicated by the bills proved in the equity case, and those found on the private bill file of the traversers, which we have said, in passing on the first exception, was improperly admitted, but the question put we think was properly allowed. Had a motion been made to strike out of the answer all reference to the traversers' bill file, and such motion had been denied, we would have held such denial error. But as the record stands we find no error in the ruling on the fourth and fifth exceptions.

The sixth exception was taken to a ruling allowing Frank Blacklock, an accountant who had examined the books and papers of the traversers for the receivers to testify as to the details of a statement of the financial condition of Blum Bros. & Harris, made by Harris, February 27th, 1900, to a reporter of R. G. Dunn & Co., and by him reduced to writing, and examined by Blacklock in connection with the books. We think this was error, though if this were the only exception, it would not be reversible error, since Dun's reporter had previously testified without objection to this statement. The question is of sufficient importance however to warrant the statement of our reasons for holding as we do, and these reasons will be found in the unreported case of *Dickerhoff* v.

*Brown*, 64 Md. xiii, which was an attachment for fraud. In that case the Court, speaking through JUDGE MILLER, said : "In regard to the reports made by these mercantile agencies, it is proper to say, it would be very hard law to place every merchant who buys a bill of goods at their mercy, and subject his property to attachment under the Act of 1864, and render his business liable to be thereby broken up, simply because of discrepancies between his condition as represented in such reports and his actual condition. The more reasonable rule is that laid down in *Victor* v. *Renlein*, 33 Hun. 549, in which the Court say : "When the only representations made, are those furnished to sellers by these agencies, it must be clearly shown that the accused buyer made the statements to the agency with the fraudulent intent to use such agency as an instrument in accomplishing a fraud upon his vendor or some other dealer."

In the case before us, we must say, as was said in *Victor* v. *Renlein*, *supra*, "that fact is not so clearly established as to justify us in saying that a fraud was perpetrated through the medium of the agency of a character sufficient to justify criminal proceedings therefor."

The seventh and last exception was taken to the admission in evidence of Harris' discharge in bankruptcy in April, 1899, but Harris having been acquitted in the trial below, no question upon this point can arise upon a new trial of the traversers, and it is unnecessary further to protract this opinion by its consideration.

> *Judgment reversed with costs to appellants above and below, and new trial awarded.*

(Decided January 17th, 1902.)