784 A.2d 1102

**Marlon Maurice CROSBY,**

v.

**STATE of Maryland.**

**No. 21, Sept. Term, 2001.**

Court of Appeals of Maryland.

Nov. 13, 2001.

George E. Burns, Jr., Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Kathryn Grill Graeff, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BATTAGLIA, Judge.

The decisional issue in this case is whether the trial court erred in admitting testimony regarding the petitioner's refusal to commit his oral statement—which was given to police detectives after he was advised of and waived his *Miranda* rights—to writing. The petitioner, Marlon Maurice Crosby,

contends that his unwillingness to provide a written statement was an invocation of his right to remain silent and that the detective's testimony at trial regarding such refusal was an improper use of that silence against him. We disagree. The petitioner's decision to decline committing his oral statement to writing is not, in this context, an invocation of his right to remain silent, and the testimony at trial concerning the petitioner's refusal did not infringe on his constitutional right to remain silent; thus, we find no error.

## I. Background

A. Facts

Micah Phipps, a manager at the K–Mart in Randallstown, Maryland, left the store after his shift at 10:45pm on April 26, 1999. As Mr. Phipps walked toward his car, which was parked in the store parking lot, a man with a bandana across his face and a gun in his hand emerged out of the bushes and walked toward him. Mr. Phipps turned and ran back to the store. He banged on the doors in an attempt to get the attention of the remaining employees inside but was stopped when the man, later identified as the petitioner, Marlon Crosby, approached Phipps, pointed the gun at him, and told Phipps to walk back to his car.

Crosby then forced Phipps to relinquish the keys to his car and climb into the trunk of the vehicle. After driving for approximately fifteen minutes, the car stopped and a second person, later identified as Eugene Robinson, got into the vehicle. During the next hour, the car stopped several times; at one stop, Phipps was told to put his coat over his face and was forced to give Crosby his wallet; at another stop, Crosby asked for the personal identification number for Phipps's bank card and for the K–Mart store keys. Phipps also was asked questions concerning the number of employees that remained in the store, when those employees were expected to go on break, and for the code to the alarm panel for the store.

Approximately one hour later, the car stopped behind the K Mart store and Phipps was told to get out of the trunk,

keeping his coat over his face. After one of the men taped Phipps's hands and mouth, Phipps was taken to the store and forced to open the door. Once inside, Crosby dragged Phipps directly to the alarm panel and told him to enter the code.[1] Initially, Phipps entered a false code number, which caused the alarm to go off. Crosby hit Phipps on the head and told him to enter the correct code. Once the correct code was entered, Crosby dragged Phipps to the office and told him to open the office door with his keys. At that time, another K–Mart employee shouted, "who is that?" which momentarily distracted Crosby, allowing Phipps to enter the office alone and lock the door behind him. Once inside, Phipps immediately telephoned the police. Crosby and Robinson fled the scene prior to the police arrival.

Despite the bandana across his face, Phipps recognized his assailant as Marlon Crosby, a former employee of K–Mart.[2] Crosby was also identified by his accomplice, Eugene Robinson, who testified as a result of a plea agreement with the State.[3]

Crosby was arrested on May 7, 1999. The subject matter of this appeal involves the post-arrest custodial interview of Crosby conducted by Detectives Rudy and Schrott of the Baltimore County Police Department. Prior to questioning the petitioner about the kidnapping and carjacking of Mr. Phipps, the detectives advised him of his *Miranda* rights and of the charges for which he was arrested. Crosby signed a

---

1. The alarm panel allows a person approximately one minute to enter the correct code before the alarm is activated. The panel was located in a discrete location under a counter on which cash registers were located. The fact that the assailant knew the exact location of the alarm panel was proffered as evidence that the assailant was likely a former or current employee of K–Mart. Crosby worked for K–Mart for six or seven months.

2. Phipps recognized the petitioner's voice, his general appearance, and that he walked with a limp.

3. Mr. Robinson pled guilty to second degree burglary on November 17, 1999 and was sentenced to three years imprisonment, with all suspended except six months (time served).

written waiver of his rights and agreed to be questioned by the detectives.

Crosby's verbal statement was not inculpatory, but rather, was an alibi for his activities on the night of April 26, 1999. Crosby informed the detectives that he was walking his dog in the late evening on April 26th, and that a friend, known as "Wink",[4] picked Crosby up in his vehicle and dropped him off about a mile from his home. Crosby continued walking home, and as he walked passed the K–Mart, which is located within a few blocks of his home, he noticed several police in the area. Crosby stated that he was afraid to be stopped by the police, so he went to the home of another friend, Ian Byrd, to ask for a ride home. Crosby further claimed that Byrd was unable to take him home because Byrd only had a provisional driver's license; therefore, Crosby decided to take "the back way" home to avoid being stopped by police.

The detectives, wanting to verify Crosby's account of the night's events, asked whether he would be willing to accompany them to Byrd's address, but Crosby refused. The detectives suspended the interview of Crosby and immediately went to Byrd's address to determine whether Byrd could corroborate Crosby's story. To the contrary, Byrd stated that he had not seen the petitioner on the evening of the 26th of April and could not have given him a ride because he did not receive his provisional driver's license until two days later, on April 28, 1999.

With this information, the detectives returned to headquarters to confront Crosby.[5] The detectives asked Crosby whether he would be willing to reduce his verbal account of the night's events to writing, but Crosby was unwilling to make a written statement. The interview was subsequently terminated and Crosby was fingerprinted and processed.

---

**4.** "Wink" was later identified as Eugene Robinson, the petitioner's accomplice. See *supra* note 3 and accompanying text.

**5.** Detective Rudy testified that Crosby remained in the interview room while he and Detective Schrott visited the Byrd residence. They were gone for approximately one hour.

The case went before a jury in the Circuit Court for Baltimore County where the sequence of the post-arrest interview was summarized by testimony from Detective Rudy:

State's Attorney: Following getting that information [from Byrd], what did you do next?

Detective Rudy: We went back to headquarters and confronted Mr. Crosby with this information.

State's Attorney: Listen to my question. Did you ask the defendant whether or not he would be willing to give you a written statement? Simply yes or no. Did you ask him?

Detective Rudy: Yes.

State's Attorney: Did he agree to give you a written statement? Simply yes or no.

Detective Rudy: No.[6]

Defense Counsel: Objection.

Court: Overruled.

## B. Legal Proceedings

The jury found Crosby guilty of carjacking, kidnaping, armed robbery, second degree burglary, and use of a handgun. He was sentenced to concurrent terms of twenty-five years for carjacking and kidnaping; he was also sentenced to fifteen years, to be served consecutively, for armed robbery, ten years (concurrent with the armed robbery sentence) for second degree burglary, and ten years (consecutive) for use of the handgun.

Crosby appealed to the Court of Special Appeals, contending that the trial court erred in failing to adhere to Maryland Rule 4–215(e) pertaining to the discharge of counsel and that the court erred in permitting testimony that Crosby refused to give the police a written statement. In an unreported opinion, the Court of Special Appeals affirmed the judgment of the Circuit Court for Baltimore County. With respect to the

---

6. We acknowledge that, in declining to make a written statement, Crosby said "No."

evidence that Crosby refused to give the police a written statement, the Court of Special Appeals applied its recent decision in *State v. Purvey*, 129 Md.App. 1, 740 A.2d 54 (1999), where the factual predicate was almost identical to Crosby's: Purvey waived his *Miranda* rights, voluntarily gave police officers an oral statement, but refused the officers' requests to reduce his statement to writing—information that was adduced at trial by testimony from both Purvey and the officer. 129 Md.App. at 17, 740 A.2d 54. The *Purvey* Court held that Purvey "did not choose to remain silent; he only refused to reduce to writing his existing statement and waiver of rights . . . . we now refuse to extend under *Miranda* . . . a refusal to write out one's statement into a full-fledged assertion of one's right to silence." *Id.* at 18–19, 740 A.2d 54. On similar grounds, the Court of Special Appeals, in the instant case, held that the trial court did not err in permitting Detective Rudy's testimony.

█ Crosby sought and we granted a writ of certiorari to consider whether the trial court erred in permitting the testimony of Detective Rudy regarding Crosby's refusal to commit his oral statement to writing. *See Crosby v. State*, 364 Md. 139, 771 A.2d 1069 (2001). The petition also requested consideration of whether a "renewed interrogation" was initiated by the detectives when they asked Crosby for a written statement.[7]

---

7. While the issue concerning Detective Rudy's testimony is the crux of the appeal, we digress momentarily to discuss the petitioner's contention that the detectives, upon their return from the Byrd residence, initiated a "renewed interrogation" by asking Crosby if he would give a written statement. Presumably, the petitioner is contending that he was entitled to be re-apprised of his *Miranda* rights when the detectives returned; the failure to so advise renders the detective's *question itself* constitutionally impermissible, and the testimony regarding that question, inadmissible. Concerns surrounding "renewed interrogations" usually arise in situations where an accused has already invoked his or her right to remain silent. The government has an interest in ensuring that one who has cloaked himself or herself in the privilege against self-incrimination is not stripped of that protection easily. *See e.g. Michigan v. Mosley*, 423 U.S. 96, 104–07, 96 S.Ct. 321, 327–28, 46 L.Ed.2d

## II. Standard of Review

Subject to supervening constitutional mandates and the established rules of evidence, evidentiary rulings on the scope of witness testimony at trial are largely within the dominion of the trial judge, *see Conyers v. State,* 354 Md. 132, 161, 729 A.2d 910, 925, *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); appellate courts, generally, will not interfere with such rulings unless there has been an abuse of discretion. *Oken v. State,* 327 Md. 628, 669, 612 A.2d 258, 278 (1992) *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993)(stating that "the scope of examination of witnesses at trial is a matter left largely to the discretion of the trial judge and no error will be recognized unless there is clear abuse of such discretion"). The discretion we afford a trial court, however, is not unlimited; when the issue is whether a constitutional right has been infringed, we make our own independent constitutional appraisal. *See Stokes v. State,* 362 Md. 407, 414, 765 A.2d 612, 615 (2001)(quoting *Jones v. State,* 343 Md. 448, 457, 682 A.2d 248, 253 (1996)); *In re Tariq A–R–Y,* 347 Md. 484, 489, 701 A.2d 691, 693 (1997); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990).

## III. Discussion

The United States Constitution and the Maryland Declaration of Rights guarantee the innocent and guilty alike the right to remain silent. *See* U.S. CONST. amend V (provid-

---

313, 321–23 (1975); *Raras v. State,* 140 Md.App. 132, 152–54, 780 A.2d 322, 334–35 (2001).

The undisputed facts in this case do not lend themselves to reasonable interpretation that an independent interrogation was initiated by the detectives, and in fact, the claims that a renewed interrogation occurred are largely inapposite: Crosby adequately waived his rights and voluntarily gave an oral statement; furthermore, the detective's request to commit his oral statement to writing occurred within a brief time from having been advised of his *Miranda* rights and the detectives did not request any new or additional information, but asked only if Crosby would be willing to reduce the information he had already given them to writing. This is not a renewed interrogation which, pursuant to *Miranda,* may result in additional responsibilities for law enforcement officials.

ing that "[n]o person ... shall be compelled in any criminal case to be a witness against himself"); MD. CONST. Decl. of Rights, art. 22 ("That no man ought to be compelled to give evidence against himself in a criminal case").[8] An inherent

8.  The Fifth Amendment is, of course, applicable to Maryland via the Fourteenth Amendment of the U.S. Constitution. *See Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653, 658 (1964). Additionally, "the privilege contained in Art. 22 is generally 'in pari materia with its federal counterpart.'" *Adkins v. State,* 316 Md. 1, 6–7 n. 5, 557 A.2d 203, 205 n. 5 (1989); *see also Ellison v. State,* 310 Md. 244, 259–60 n. 4, 528 A.2d 1271, 1278–79 n. 4 (1987).

    This Court has maintained that the right to remain silent "has always been liberally construed in order to give fullest effect to this immunity...." *Allen v. State,* 183 Md. 603, 607, 39 A.2d 820, 821 (1944)(citing *Blum v. State,* 94 Md. 375, 381, 51 A. 26, 28 (1902)). Notably, we have previously interpreted Maryland's privilege against self-incrimination to be more comprehensive than that of the federal government. Judge Eldridge, writing for this Court in *Hardaway v. State,* 317 Md. 160, 161, 562 A.2d 1234 (1989), held that absent special circumstances, instructing a jury, over the defendant's objection, that the defendant has a constitutional right not to testify and that no adverse inference should be drawn from his election to remain silent violated state common law and was reversible error. We explained that because the cautionary instruction is itself, a constitutional right of the defendant, it should, like other rights, be waivable by the defendant. *Id.* at 166–67, 562 A.2d at 1237. In so holding, this Court departed from Supreme Court jurisprudence which provided that the giving of a cautionary instruction over a defendant's objection did not violate his privilege against self-incrimination. *See Lakeside v. Oregon,* 435 U.S. 333, 340–41, 98 S.Ct. 1091, 1095, 55 L.Ed.2d 319, 326 (1978). The predicate of this deviation, which effectively extended a defendant's constitutional protections, was our State's common law and "the approach taken by this Court generally with respect to defendants' rights and entitlements in criminal cases." *Hardaway, supra* at 168, 562 A.2d at 1238.

    Additionally, through reliance on State evidentiary law, the Court of Special Appeals has provided greater protection for a defendant's silence than the Supreme Court by asserting that an accused's post-arrest, pre-*Miranda* warning, silence is inadmissible for impeachment because the probative value, if any, of such evidence, is clearly outweighed by its potential for unfair prejudice. *See Grier v. State,* 351 Md. 241, 718 A.2d 211, 220 (1998)(noting that while this Court has not had occasion to address the issue of whether post-arrest, pre-*Miranda* warning, silence is admissible for impeachment purposes, the Court of Special Appeals has reviewed this issue and held that post-arrest, pre-*Miranda* warning silence is too ambiguous to be admissible, even as impeachment evidence)(*e.g. Key–El v. State,* 349 Md. 811, 818, 709 A.2d 1305,1308 (1998) (explaining that Maryland courts have distinguished between post-arrest and pre-arrest silence); *Wills v. State,* 82 Md.App.

component of this guarantee is that one who invokes the privilege against self-incrimination shall remain free from adverse presumptions surrounding the exercise of such right. *See* Maryland Code (1973, 1998 Repl.Vol.), § 9–107 of the Courts and Judicial Proceedings Article (providing that "[t]he failure of a defendant to testify in a criminal proceeding on this basis does not create any presumption against him"); *see Younie v. State,* 272 Md. 233, 244, 322 A.2d 211, 217 (1974)(stating that no penalty shall flow from the exercise of one's right to remain silent).

■ Cognizant of the fundamental importance of the privilege against self-incrimination—an essential pillar of our adversary system—the Supreme Court adopted certain procedural safeguards to ensure the protection of this right in the context of a custodial interrogation. Pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), an individual in police custody must be warned, prior to any interrogation, that he has the right to remain silent, that anything he says can be used against him in a court of law, and that he has the right to the presence of an attorney, either retained or appointed. *Miranda,* 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726; *McIntyre v. State,* 309 Md. 607, 612–13, 526 A.2d 30, 32 (1987)(quoting *Fare v. Michael C.,* 442 U.S. 707, 717, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197, 207, *reh'g denied,* 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979)). Only after adequate waiver of those rights may a police officer question an accused. As this Court has stated, "in undertaking to prove a waiver of *Miranda* rights, 'a heavy burden rests

_____

669, 674, 573 A.2d 80, 83 (1990), finding error when evidence of a defendant's post-arrest, pre-*Miranda* silence was admitted for impeachment purposes because the potential for prejudice outweighed the probative value). The Supreme Court concluded that the use of a defendant's post-arrest, pre-*Miranda* silence to impeach did not offend federal due process guarantees; however, the Court commented that states are free to determine, as a matter of state constitutional law or rules of evidence, whether to preclude the admission of this evidence, *see Fletcher v. Weir,* 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490, 494 (1982), which is precisely the action the Court of Special Appeals determined was appropriate.

on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' " *McIntyre*, 309 Md. at 614–15, 526 A.2d at 33 (quoting *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724). Neither party in this case disputes that the petitioner knowingly and voluntarily waived these rights prior to the commencement of the initial police interview.[9]

■ The protections bestowed upon citizens by the privilege against self-incrimination do not disappear once the accused initially waives his or her rights. An accused may invoke his or her rights at any time during questioning, or simply refuse to answer any question asked, and this silence cannot be used against him or her. *See Doyle v. Ohio*, 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91, 97 (1976)(stating that "[s]ilence in the wake of [*Miranda* ] warnings may be nothing more than the arrestee's exercise of these *Miranda* rights"); *Younie v. State*, 272 Md. at 244–45, 322 A.2d at 217 (1974)(stating that "[s]ilence in the context of a custodial inquisition is presumed to be an exercise of the privilege against self-incrimination from which no legal penalty can flow ..." and "we must assume that the petitioner's failure to answer was an invocation of his fifth amendment privilege"). Because the petitioner, in this case, was *not* silent in responding to a particular question, it is clear that the outcome of this case depends on whether, by refusing to put into writing that which had already been spoken, he *invoked* his right to remain silent, and if he did, whether the testimony concerning such invocation was improperly permitted at the

---

**9.** Detective Rudy read each of the rights from a standard *Miranda* rights card, and the petitioner himself was given the opportunity to read each right. The petitioner placed his initials beside each itemized right and signed, with his full signature, below the text that read "my decision to waive these rights and be interviewed is free and voluntary on my part." Furthermore, in denying the petitioner's pre-trial motion to suppress the oral statement, the presiding judge stated, "[the petitioner] was fully apprized and understood his rights, and ... he freely spoke with the detective ... his statement to the police was voluntary."

petitioner's trial and impinged his constitutional right to remain silent.

■ In turning to the propriety of Detective Rudy's testimony, we reiterate that the issue is whether, by refusing to put into writing that which had already been spoken, Crosby invoked his right to remain silent. This is a novel issue before our Court; however, our brethren in the Court of Special Appeals addressed a factually similar circumstance in *State v. Purvey, supra,* 129 Md.App. 1, 740 A.2d 54. After waiving his *Miranda* rights, Purvey gave police officers an oral statement, but refused the officers' requests to reduce his statement to writing. 129 Md.App. at 17, 740 A.2d at 63. Both Purvey and one of the police officers testified to this sequence of events at trial. *Id.* The Court of Special Appeals held that Purvey "did not choose to remain silent; he only refused to reduce to writing his existing statement and waiver of rights ..." and thus, the Court "refuse[d] to extend under *Miranda* ... a refusal to write out one's statement into a full-fledged assertion of one's right to silence." *Id.* at 18–19, 740 A.2d at 64. We believe that this holding both comports with the principles articulated under *Miranda* and its progeny, and it providently declines to extend *Miranda's* application to an illogical extreme. Furthermore, we agree with the Court of Special Appeals' reasoning in *Purvey* and find this analysis to be applicable to the case at hand.

■ While the Supreme Court has not explicitly addressed the propriety of testimony concerning an accused's refusal to commit a validly given oral statement to writing, several principles articulated by the Supreme Court in *Connecticut v. Barrett,* 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), provide guidance when considering the issue before us today.[10]

---

**10.** The Supreme Court in *Connecticut v. Barrett,* 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), considered whether the Constitution required suppression of an accused's oral confession, which was given after voluntarily waiving his *Miranda* rights, because the accused refused to give a written statement without his attorney present. The Connecticut Supreme Court held that the defendant's refusal to give a

Specifically, the Supreme Court reiterated that "[t]he fundamental purpose of the Court's decision in *Miranda* was 'to assure that *the individual's right to choose* between speech and silence remain unfettered throughout the interrogation process." 479 U.S. at 528, 107 S.Ct. at 831, 93 L.Ed.2d at 927 (citing *Miranda,* 384 U.S. at 469, 86 S.Ct. at 1625, 16 L.Ed.2d at 721)(emphasis in original). It is the choice between speech and silence that must remain unfettered, not the choice between *different forms* of speech. If, after proper advisement of *Miranda* rights, an accused states, "I'll talk to you, but I don't want my statement to be video/tape recorded" or "I'll give you a verbal statement, but I will not make a written statement," are we to conclude, as the petitioner contends, that the accused has invoked his or her *Miranda* rights and as such, that the police are thereafter forbidden from questioning the accused? Or, alternatively, if the police ask the accused whether his or her oral statement, voluntarily given, may be altered into a different *form* of speech—e.g., tape recorded, video recorded, reduced to writing, or translated into a different language—and the accused refuses, are we to conclude that the refusal *alone* should be considered an invocation of the right to remain silent? Such a conclusion stretches the purposes of *Miranda* to illogical and irrational extremes. That the defendant chooses one form of speech over another does not necessarily signify, *absent some additional evidence,* that the defendant has chosen silence over speech.

---

written statement without his attorney present was a clear invocation of his right to the assistance of counsel, and thus the oral statement should have been suppressed. 479 U.S. at 526, 107 S.Ct. at 830, 93 L.Ed.2d at 926. The Supreme Court reversed the Connecticut decision, stating that "we know of no constitutional objective that would be served by suppression in this case. It is undisputed that Barrett desired the presence of counsel before making a written statement.... Barrett's limited requests for counsel, however, were accompanied by affirmative announcement of his willingness to speak with the authorities." 479 U.S. at 529, 107 S.Ct. at 832, 93 L.Ed.2d at 928. While factual similarities with the *Barrett* case exist, *Barrett* was decided on distinct and unique legal grounds, i.e. the effect a limited invocation of the right to counsel had on an otherwise validly given oral statement, and thus the issue concerning the testimony of Barrett's refusal to commit his statement to writing was never specifically addressed.

Other jurisdictions that have considered this issue have similarly held that no invocation of the right to remain silent occurs when a defendant simply refuses to write the very statement he or she already orally gave the police. The Court of Appeals of New York, in *People v. Hendricks*, 90 N.Y.2d 956, 665 N.Y.S.2d 45, 687 N.E.2d 1328 (1997), considered whether a police officer's testimony that the defendant, after receiving *Miranda* warnings, agreed to talk to police but refused to put anything in writing, constituted an impermissible comment on the defendant's invocation of his right to remain silent. The Court held that the defendant had not invoked his right to silence, stating, "[d]efendant's preference for making his statement orally rather than in writing was not, in this context, an indication that he wanted to cut off further inquiry, which would have invoked his right to silence." *Id.* at 46, 687 N.E.2d 1328. Similarly, in the case *sub judice*, there is no evidence that the petitioner wished to terminate all communication with the police, but rather, he preferred not to make a written statement *of the story he had already given* verbally.

In *State v. Adams*, 127 N.J. 438, 605 A.2d 1097, 1101 (1992), the Supreme Court of New Jersey held that a defendant who told a detective that, although he did. not wish to sign a written statement, he would talk about the incident, never invoked his right to remain silent.[11] The Supreme Court of Kansas similarly held that a defendant's refusal to provide a written statement of his verbal admissions, made after waiving

---

11. Unlike the case presently before us, the primary contention by the defendant in *State v. Adams, supra,* was that he did not validly waive his constitutional protection against self-incrimination. The New Jersey Supreme Court rejected the argument that a person's willingness to communicate orally but not in written form should be an indication that the waiver was "unknowingly and unintelligently" given, stating that "[a] defendant's waiver is not unintelligent merely because it is unwise .... a properly-warned defendant's waiver is no less voluntary and knowing and intelligent because ... he thought that what he said could not be used because it was only oral ..." *Adams*, 605 A.2d at 1102 (quoting *State v. McKnight*, 52 N.J. 35, 243 A.2d 240, 251 (1968)(internal quotations omitted)).

his *Miranda* rights, was not an invocation of his right to remain silent, explaining that,

> [a]fter being fully advised of his rights under *Miranda*, appellant chose to discuss the alleged crime with the officer and freely did so. Never did he indicate that he wanted to invoke his right to remain silent and nowhere does it appear that his refusal to give a written statement was an attempt to invoke such rights.

*State v. Lowe*, 238 Kan. 755, 715 P.2d 404, 411 (1986) *overruled on other grounds*, 242 Kan. 64, 744 P.2d 856 (1987). Again, the petitioner in this case, after proper advisement of his rights, volunteered to discuss the night in question, and in fact, willingly provided an alibi for his whereabouts, denying any and all association with the K-mart burglary and robbery of Mr. Phipps. The petitioner's refusal to give the detectives a written version of his alibi cannot, in this context, be construed as an invocation of his right to remain silent.

As the Missouri Court of Appeals succinctly stated in a factually similar case, one's "refusal to make a written statement, *without more*, [is] not an invocation of [the] right to remain silent." *State v. Moorehead*, 811 S.W.2d 425, 430 (Mo.Ct.App.1991) (emphasis added). By emphasizing "without more" we wish to caution courts, prosecutors, and police on the narrowness of this decision. The right to remain silent is *not* invoked by one who validly waives his or her *Miranda* rights, voluntarily gives an verbal statement, but refuses to reduce to writing the *very* statement he or she just gave verbally. If the accused, however *chooses silence over speech*—and not simply one form of speech over another, i.e. oral over written—then the police and courts must operate to ensure that the rights of the accused are scrupulously honored.[12] *See Miranda*, 384 U.S. at 478–79, 86 S.Ct. at 1630, 16

---

**12.** If some evidence exists that the detectives asked additional questions concerning matters not yet covered by the prior questioning and the accused was silent, or alternatively, if the accused verbally stated that he would not make any additional statements, then these may be examples of situations where the accused is choosing silence over speech. In Crosby's situation, the detectives did not ask questions

**534**

L.Ed.2d at 726 (explaining that the procedural safeguards were necessary "to assure that the exercise of the right [of silence] will be scrupulously honored").

Because we hold that the petitioner's refusal to reduce his oral statement to writing was not an invocation of his right to remain silent, the testimony elicited at trial regarding this refusal cannot be construed as an infringement upon his constitutional privilege against self-incrimination.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.*

HARRELL, Judge, Concurring.

I concur in the judgment only. Although I would have found error, under the greater protections offered by Art. 22 of the Maryland Declaration of Rights than the Fifth Amendment (*See* Maj. op. 366 Md. at 524, n. 6), in the allowance of the State's use of Crosby's refusal to give a written statement, I also would have concluded, on the record of Crosby's trial, such error to be harmless beyond a reasonable doubt. *See Brown v. State,* 364 Md. 37, 42, 770 A.2d 679, 682 (2001).

The store manager/victim identified Crosby. Although masked, Crosby, a former employee of the K–Mart, was recognized by the manager based on Crosby's voice, a known limp, and his general appearance. Crosby's co-defendant, Eugene Robinson, corroborated the manager's identification. Moreover, the facts that the manager's assailant knew of the store's alarm panel and that his victim was the manager with keys to the store and the code to disarm the alarm panel corroborated that the assailant was more likely a former employee of the K–Mart. Finally, Crosby's own statements to

---

concerning matters not yet covered; rather, they merely asked Crosby to reduce the information *already given* (verbally) to a written statement. Furthermore, Crosby did not state, nor indicate, that he no longer wanted to communicate with the police altogether; rather Crosby declined a specific means of communication, i.e. the written statement.

the police, including the false alibi about being with Byrd, inculpated him. Based on this, I would conclude that there is no reasonable probability that the jury's verdict would have been different had the fleeting reference to Crosby's refusal to give a written statement never occurred. *See Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976). Therefore, I would affirm the judgments below.