*Clement Reynolds v. State of Maryland*, No. 84, September Term 2017.  Opinion by Hotten, J.

**CRIMINAL LAW – CONSTITUTIONAL LAW – SILENCE –** The Court of Appeals held that an individual's post-*Miranda* silence is generally inadmissible as substantive evidence.  A suspect's post-arrest silence is more prejudicial than probative, and generally should not be admitted.  *Kosh v. State*, 382 Md. 218, 230, 854 A.2d 1259, 1267 (2004).  Constitutional safeguards protect an individual's desire to remain silent from being introduced as evidence of guilt.

**CRIMINAL LAW – CONSTITUTIONAL LAW – IMPEACHMENT –** The Court of Appeals held that inconsistent statements made to law enforcement officers after invoking *Miranda* protections are admissible for impeachment purposes.  *See Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643 (1971).

**CRIMINAL LAW – CONSTITUTIONAL LAW – IMPEACHMENT –** Where statements made to law enforcement officers are not omissions, or selective silence, those may be used for impeachment purposes if the evidence is probative.  If "the impeaching material would provide valuable aid to the jury in assessing the defendant's credibility; again, 'the benefits of this process should not be lost.'"  *Oregon v. Hass*, 420 U.S. 714, 722, 95 S.Ct. 1215, 1221 (1975).  Here, Reynolds's affirmative statements were of probative impeachment value because Reynolds told arresting officers critical facts about his alibi that were directly inconsistent with his trial testimony.

Circuit Court for Montgomery County
Case No. 125040C
Argued: May 8, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 84

September Term, 2017

_____

CLEMENT REYNOLDS

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Hotten, J.

_____

Filed: August 27, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

On May 29, 2014, Petitioner Clement Reynolds ("Reynolds") was indicted by the Grand Jury for Montgomery County on charges of first degree murder, conspiracy to commit first degree murder, and use of a handgun in the commission of a crime of violence, stemming from the killing of Wesley King on November 18, 2002. On October 20, 2014, the Circuit Court for Montgomery County held a hearing to address Reynolds's Motion to Suppress Custodial Statements, which was granted in part and denied in part. Following a seven-day jury trial commencing on January 5, 2015, Reynolds was convicted of all counts. On March 31, 2015, Reynolds was sentenced to concurrent life sentences for each of the first degree murder and conspiracy to commit murder counts, and twenty years imprisonment for the use of a handgun in commission of a crime of violence, to be served consecutively. The first five years of his sentence for the use of a handgun charge was without parole, pursuant to Criminal Law ("Crim. Law") Article § 4-204[1] of the Maryland Code.

Thereafter, Reynolds noted an appeal to the Court of Special Appeals, which affirmed the judgment of the trial court in an unreported opinion on November 8, 2017. *Reynolds v. State*, No. 0182, Sept. Term, 2015, 2017 WL 5171593 (Md. Ct. Spec. App. Nov. 8, 2017), *cert. granted*, 457 Md. 399, 178 A.3d 1242 (2018). Reynolds now seeks this Court's review regarding whether he was "denied due process when the trial court permitted the prosecutor to question [him] about 'what he did *not* tell the police about his

---

[1] *See* Crim. Law § 4-204(c)(1)(i) requiring that a person guilty of using a firearm in a commission of a crime "shall be sentenced to imprisonment for not less than 5 years and not exceeding 20 years."

alibi defense, even though the omissions were a result of Reynolds['s] post-arrest, post-*Miranda*[2] invocation of silence and were not inconsistencies with his trial testimony." We answer this question in the negative and affirm the judgment of the Court of Special Appeals.

## BACKGROUND

On April 14, 2014, Reynolds was arrested at John F. Kennedy International Airport in New York. An open warrant was issued on March 25, 2003 for "Kevin Reynolds" regarding the November 18, 2002 murder of Wesley King ("King") in Montgomery County, Maryland. King was shot and killed outside of his apartment in Silver Spring, Maryland. A warrant for Kevin Reynolds remained unserved until 2014, when it was discovered that Kevin Reynolds was using the name of Dennis Graham. Upon his arrest in New York, Reynolds was carrying a United States passport, a Connecticut driver's license, and other documents bearing the name of Dennis Graham. Although officers took Reynolds's fingerprints to ascertain whether he was the subject of the warrant, the analysis was not completed for several days. Reynolds was taken to a New York City precinct, where he was detained until Montgomery County Detectives Sean Riley and Frank Colbert arrived to interview him.

---

2 In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), the Supreme Court held, *inter alia*, that an individual has a right to remain silent during a custodial interrogation.

The detectives informed Reynolds that they wanted to interview him about a murder from 2002. Prior to advising Reynolds of his *Miranda* rights, Detective Colbert asked Reynolds his name, and he replied "Dennis Graham." Detective Colbert asked Reynolds for his date of birth, whether he was in good physical condition, whether he was sober, how far he went in high school, and whether he spoke languages other than English. The detectives told Reynolds they believed he was using an alias, which the fingerprints would soon confirm.

Detective Colbert read Reynolds his *Miranda* rights at 2:17 a.m. Reynolds refused to sign an Advice of Rights form, but Reynolds answered affirmatively that he understood his rights. Detective Colbert asked Reynolds whether he had ever been to Maryland, to which Reynolds replied, "I've been through Maryland." When asked whether he had heard of Montgomery County, Maryland or of a cold case homicide from 2002, Reynolds replied that he knew of the County, but not the homicide. Eventually, the detectives asked Reynolds directly whether he was Kevin Reynolds, to which he replied no. Detective Colbert then told Reynolds that "[t]here's overwhelming evidence that you murdered somebody back in November of 2012 [sic]" and that this was Reynolds's "opportunity to talk this out." Reynolds replied, "[t]here's nothing I have to say."

The suppression court ruled that everything up to this point was admissible because Reynolds had not yet invoked his right to remain silent, but found that Reynolds's last reply was a clear and unambiguous invocation of Reynolds's right to remain silent.

Despite the fact, as the suppression court found, that Reynolds asserted the right to remain silent, the police interrogation continued. Detective Colbert told Reynolds he had a "list of evidence... [a]nd it's overwhelming... [i]t's your time to speak up about this." Reynolds repeated, "[t]here's nothing I have to say. You're trying to solve a homicide and[.]" Detective Colbert interjected "our homicide is solved... I'd rather you just tell me to go to hell and get out of here." Detective Colbert asked Reynolds what country he was in during November of 2002. Reynolds responded, "November of 2002? I was probably in the Virgin Islands." Reynolds indicated that he had family there. Detective Colbert then asked Reynolds if he thought the evidence described by the detectives was enough to convict someone. Reynolds initially responded, "I don't know." When Detective Colbert added that Reynolds left the country after the homicide, Reynolds repeated, "I don't know. Nothing else to say."

Detective Colbert also engaged Reynolds in a conversation about Reynolds's life. Reynolds told Detective Colbert that he came to the United States and settled in Morris Plains, New Jersey, where he sold cars with a man named Byron Matamora. Reynolds told Detective Colbert that he resided in two other towns in New Jersey with Rose Lopez, who was his girlfriend at the time. Detective Colbert again asked, "[n]othing else you want to talk about?" Reynolds responded, "I guess not, no."

4

On April 30, 2014, the same detectives interviewed Reynolds in Montgomery County, Maryland. Reynolds immediately invoked his right to counsel. Notwithstanding the invocation, Detective Colbert continued to interview Reynolds.[3]

*The Suppression Hearing*

On October 20, 2014, the Circuit Court for Montgomery County held a suppression hearing to consider the statements Reynolds made during the April 14, 2014 and the April 30, 2014 interviews. Reynolds's trial counsel argued that Reynolds repeatedly invoked his right to remain silent in the April 14 interview, when he indicated that he had "nothing to say" about the murder, and that his statements following the first invocation were inadmissible because they were taken in violation of *Miranda*. Additionally, Reynolds asserted that Detective Colbert acted in bad faith by continuing to question Reynolds after the invocations, so the statements were inadmissible at trial for any purpose. The State averred that Reynolds never unambiguously invoked his right to remain silent, and that Detective Colbert did not act in bad faith. According to Detective Colbert, Reynolds "was trying to get me to believe his spin on the story [that he was "Graham"], and it was my job to try to get the facts out…."

The suppression court ruled that Reynolds invoked his right to remain silent the first time he stated that "[t]here's nothing I have to say[]" about the murder. The court held that a majority of the April 14 interview was in violation of *Miranda*, and therefore inadmissible

---

[3] Reynolds's statements from the April 30 interview were not the subject of impeachment at trial.

5

as substantive evidence.  However, the court also determined that the statements elicited during the April 14 interview were voluntary and thus, admissible under *Harris*[4] and *Hass*[5] for impeachment purposes, should Reynolds elect to testify at trial.  Regarding the April 30 interview, the State maintained that even if the statements were obtained in violation of *Miranda*, they were voluntarily made.  The court ruled that the statements in the April 30 interview were involuntary and inadmissible, except for Reynolds's response to pedigree or booking questions.  Ultimately, the suppression court precluded the State from introducing any statements after Reynolds's *Miranda* invocation in its case-in-chief.  Before this Court, the State asserts that because Detective Colbert did not purposely violate *Miranda*, and Reynolds's statements were voluntary, the statements could be used for impeachment purposes.

*The Trial*

Wesley's daughter, Nickesha King ("Nickesha"), who was eleven years old at the time of the murder, testified that while walking with her father outside of their apartment on the evening of November 18, 2002, they were approached by two men dressed in black.  One man pulled Nickesha aside while the other man, who she identified as Reynolds,

---

[4] In *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643 (1971), the Supreme Court held that statements procured by law enforcement in violation of *Miranda* could be used for impeachment purposes at trial.

[5] The Supreme Court held in *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215 (1975) that information obtained by officers after *Miranda* warnings is admissible for impeachment purposes if an individual testifies inconsistently with the inculpatory information.

pinned King down and shot him. As King fell, the two men ran to a white van and drove away with the door open. At trial, Nickesha identified Reynolds as the shooter, who she recognized because he stayed with her family during the summer of 2002. Nickesha testified that there was no doubt in her mind that Reynolds was the man who shot and killed King.

Detective James Drewry testified that he recovered a cell phone from the murder scene, and eventually traced the cell phone number to a salon located in Brooklyn, New York. The salon was operated by Simone Smith ("Smith"), who was Reynolds's wife at the time of the murder.

Detective Scott Sube, an expert on cell mapping and network operations, also testified for the State. Detective Sube presented a detailed chart that tracked which towers registered pings from the subject cell phone on the day of the murder. The chart reflected that pings from a call at 5:18 p.m. registered to cell towers in Manhattan, New York. Subsequent pings from cell phone calls were registered with towers indicating that the phone traveled south on the I-95 corridor from New York, through New Jersey and Baltimore. Another chart displayed three cell phone calls being made between 10:10 p.m. and 10:43 p.m. The final call was made at 10:43 p.m., seventeen minutes before the murder occurred, pinged off a Silver Spring cell tower located .54 of a mile from the scene of the murder.

Pursuant to the suppression court's ruling, no evidence relative to the April 14 or April 30 interviews was offered in the State's case-in-chief.[6]

Reynolds elected to exercise his right to testify. During direct examination, he testified regarding his personal and professional life. He was born in Jamaica, adopted by a prominent family, and completed two years of college. Reynolds was sixteen years old when he first met King, who was ten to twelve years his senior, while working for Reynolds's family business. Reynolds continued to stay in touch with King and his family after they migrated to the United States. Reynolds met his wife, Smith, in Jamaica before she moved to the United States in 1998. Reynolds followed Smith there a year later. The couple had a baby born in 2000 and settled in New York. Reynolds acquired a fake New York driver's license in the name of Kevin Reynolds.

Reynolds admitted that he used to deal drugs with King. He became involved in selling drugs with King and his family in California. Reynolds helped King move to an apartment in Maryland and bought him furniture. Reynolds would transport marijuana from New York to Maryland in his minivan. Reynolds testified that he and King enjoyed a positive relationship, and he held no animosity against King at the time of King's death.

Reynolds testified that on the day of King's murder he was in Brooklyn, New York and picked up his daughter from daycare at 6:00 p.m. According to Reynolds, he arrived

---

[6] During trial, Reynolds and the State jointly stipulated that after Reynolds's arrest and subsequent interview on April 14, 2014, he stated that his name was Dennis Graham, denied that he was Kevin Reynolds, denied that he had ever been in the State of Maryland, and denied that he had a relationship with Simone Smith in 2002.

8

home around 6:30 p.m., where a babysitter, Karlene Gill, was present. Smith returned home shortly after 8:00 p.m. Reynolds testified that he had an appointment with Caroline George to conduct an estimate for repairs on her home. He left his apartment between 9:30 p.m. and 10:00 p.m. and arrived at George's house around 10:30 p.m. Reynolds left shortly after 11:00 p.m. and arrived home around midnight, where he saw both Smith and Gill.

Reynolds testified that around 1:00 a.m., the following morning, Smith began receiving phone calls and Reynolds learned that King had been killed. Following King's murder, Reynolds quickly learned that he was a suspect. Four days later, Reynolds created an alias, Dennis Graham, and ultimately left for Jamaica in December of 2002. Reynolds returned to the United States various times over the next decade. Upon Reynolds's return to the country in April of 2014, Reynolds was apprehended for King's murder.

On cross-examination, the State addressed inconsistent statements Reynolds made during the April 14 police interview, which were at odds with his trial testimony. The State asked Reynolds:

> [STATE]: Didn't you tell the police, that in November of 2002, you were in the Virgin Islands?
>
> [REYNOLDS]: Yes, I did.
>
> [STATE]: And didn't you also tell the police that you had never been to Maryland more than passing through?
>
> [REYNOLDS]: Yes, I did.
>
> [STATE]: So, you didn't tell them what you're telling the jury today, that Wesley King was your great friend and you regularly saw him and shared an apartment with him?
>
> [DEFENSE COUNSEL]: Objection.

9

THE COURT: Overruled.

[REYNOLDS]: No, I was uncertain the capacity [sic] of Dennis Graham at that time.

[STATE]: So you were pretending to be somebody else to the police and hoping you could convince them of that?

[REYNOLDS]: Right, I was hoping to preserve the identity of Dennis Graham. So, I was answering those questions with that in mind.

****

[STATE]: And you told the police that when you first came to the United States, that you worked selling cars with Byron Matamora (phonetic sp.), correct?

[DEFENSE COUNSEL]: Objection

THE COURT: Overruled

[REYNOLDS]: Yes.

[STATE]: Now Byron Dwyer?

[REYNOLDS]: Correct.

[STATE]: Are there two Byrons?

[REYNOLDS]: No.

[STATE]: So, which is his correct last name?

[REYNOLDS]: His name is Dwyer.

[STATE]: And you didn't work selling cars with him, correct?

[REYNOLDS]: I helped him when he was, when I came back to the States in '03, and I was staying with him out in Jersey. I used to help him out, selling cars.

[STATE]: And you also told the police that you were living with a girl named Rose, correct?

[REYNOLDS]: Correct.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[STATE]: And when asked what Rosa's [sic] last name was, you said Lopez, correct?

10

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[REYNOLDS]: Correct.

[STATE]: Is Rose Lopez a real person?

[REYNOLDS]: Yes, she is.

[STATE]: Who is Rose Lopez?

[REYNOLDS]: She was a neighbor of Byron Dwyer that I used to see back then.

[STATE]: And is it someone you've had a relationship with, or was that a lie, too?

[REYNOLDS]: I, we had relationships, yes.

[STATE]: So, instead of telling the police about Caroline George, or Karlene Gill, who could truly alibi you, you started naming Rose Lopez and Byron Matamora, who isn't even a real person?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[REYNOLDS]: Yes.

[STATE]: And just so we're clear, you never said anything about Caroline George or Karlene Gill?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[REYNOLDS]: Like I said, at that time, I was preserving my identity as Dennis Graham. So, I was answering in the capacity of Dennis Graham.

[STATE]: Because you were hoping the Dennis Graham cover would work first, correct?

[REYNOLDS]: Correct.

[STATE]: And when the Dennis Graham cover fell through, and we realized that you aren't Dennis Graham, now you create the second cover, which is the alibi, correct?

[REYNOLDS]: I did not create the second cover.

[STATE]: But you agree, you've never mentioned the alibi to the police?

11

[DEFENSE COUNSEL]: Objection.  May we approach.

At the bench, Reynolds's counsel moved for a mistrial, arguing that the State impermissibly cross-examined Reynolds regarding details he did not disclose to the detectives, even though Reynolds asserted his right to remain silent during the interview.  The trial court denied the motion, but gave an instruction to the jury limiting prior witness statements to be considered only to aid the jury in determining the credibility of witness testimony.

On January 13, 2015, a jury convicted Reynolds on all counts and the trial court sentenced him on March 31, 2015.  Thereafter, Reynolds noted a timely appeal to the Court of Special Appeals.

*The Court of Special Appeals*

Before the Court of Special Appeals, Reynolds challenged, *inter alia*, the trial court's decision to admit portions of his post-arrest statements and the denial of his motion for mistrial.  *See Reynolds*, 2017 WL 5171593, at *1 (querying "[d]id the trial court err in permitting any portion of either custodial statement to be used at trial and in denying Reynolds's motion for a mistrial as a result of such use?").  Reynolds argued that his request for a mistrial should have been granted, because the State cross-examined him regarding his failure to disclose the identity of certain alibi witnesses during the April 14 interview.  *Id.* at 11.  Reynolds asserted that such questions constituted the use of silence against him, and thus were violations of *Miranda*.  *Id.*  The State countered that it was not using his silence against him, but rather, was impeaching him regarding the conflict between his statements during the April 14 interview and his alibi testimony at trial.  *Id.*

The Court of Special Appeals agreed with the State that the questions asked at trial were "classic impeachment, relating to what [Reynolds] *said* during the April 14 interview and how it differed from his trial testimony." *Id.* (Emphasis in original). The Court of Special Appeals noted that during Reynolds's initial interview, he "claimed to be Dennis Graham; denied knowing the victim; claimed to be in the Virgin Islands at the time of the murder; claimed to have only 'been through' Maryland in the past; said he worked with Byron Matamora; and stated that he was in a relationship with Rose Lopez at the time of the murder." *Id.* To the contrary, during Reynolds's direct examination, he admitted that he was Clement Reynolds; that he was married to Simone Smith at that time; that he was actually in New York at the time of the murder; and that he never mentioned Caroline George or Karlene Gill as part of his alibi. *Id.* The Court assessed that the State was pointing out these discrepancies to contradict his in-court testimony, not to use his silence against him. *Id.* Finding that the State's use of Reynolds's inconsistent testimony was not error, the Court of Special Appeals affirmed his conviction. Reynolds filed a timely petition for *certiorari*, asking us to consider whether his right to due process was violated when the trial court allowed the State to cross-examine him regarding statements related to his alibi defense that were elicited after he invoked *Miranda*.

### STANDARD OF REVIEW

"Subject to supervening constitutional mandates and the established rules of evidence, evidentiary rulings on the scope of witness testimony at trial are largely within the dominion of the trial judge[.]" *Crosby v. State*, 366 Md. 518, 526, 784 A.2d 1102, 1106

13

(2001). "Generally, appellate courts review the denial of a motion for a mistrial under the abuse of discretion standard[.]" *Dillard v. State*, 415 Md. 445, 454, 3 A.3d 403, 408 (2010). We will not disturb the trial court's ruling "unless there has been an abuse of discretion of a character likely to have injured the complaining party." *Grandison v. State*, 341 Md. 175, 243, 670 A.2d 398, 432 (1995). "[T]rial judges have wide discretion to admit or exclude items of evidence...." *Gauvin v. State*, 411 Md. 698, 710, 985 A.2d 513, 520 (2009). Where the evidentiary ruling is a discretionary one, "a trial court's ruling on the admissibility of evidence is reviewed pursuant to the 'abuse of discretion' standard." *Brown v. Daniel Realty Co.*, 409 Md. 565, 583, 976 A.2d 300, 310–11 (2009). However, "[w]here a party complains that the trial judge's action abridged a constitutional right," this Court's review is *de novo*. *Savage v. State*, 455 Md. 138, 157, 166 A.3d 183, 194 (2017). Although Reynolds alleges a due process violation of his Fifth and Fourteenth Amendment rights, the alleged violation occurred as a result of the trial judge's discretionary decision to allow impeachment questions. We will conduct our own appraisal of Reynolds's constitutional arguments and review the trial judge's admissibility determinations for an abuse of discretion.

## DISCUSSION

Although Reynolds's claim rests upon constitutional rights as discussed in *Miranda* and its progeny, we address the rights afforded by the Federal constitution, the Maryland constitution, and Maryland common law. Reynolds claims that the trial court denied him due process by permitting the State to question him about his failure to disclose an alibi

14

defense after he invoked *Miranda*.  Reynolds asserts that a reading of *Miranda* dictates that an individual has a right to remain silent during a custodial interrogation.  During the April 14 interview, when Reynolds told police officers "[t]here's nothing I have to say[,]" he avers that the State's cross-examination regarding what he did not tell the police following an invocation of his right to remain silence, constituted reversible legal error.  The State counters that even statements taken in violation of *Miranda* can be used to impeach a witness's prior inconsistent statement.  Reynolds's claim requires us to interpret and apply *Miranda* and its progeny.  As explained *infra*, an invocation of *Miranda* does not preclude the State from impeaching a witness concerning prior inconsistent statements, even after a suspect invokes his right to remain silent.

*Constitutional Considerations*

The Federal and State constitutions unequivocally protect the right to remain silent in the face of custodial interrogation by law enforcement.  An individual's due process rights are the tenets of two foundational constitutional provisions: the Fourteenth and the Fifth Amendments.  The Due Process Clause to the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV.  Article 24 of the Maryland Declaration of Rights, a corollary to the federal Due Process Clause, similarly provides that "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."  Md. Const., Declaration of Rights,

15

Art. 24. "The due process clause of Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment to the [United States Constitution] have the same meaning; and we have said that Supreme Court interpretations of the federal provision are authority for the interpretation of Article 24." *Dep't of Transp. v. Armacost*, 299 Md. 392, 415–16, 474 A.2d 191, 203 (1984).

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be... compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law...." U.S. Const. amend. V. The Fifth Amendment is applicable to the states through the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489 (1964). Similarly, Article 22 of the Maryland Constitution provides "no man ought to be compelled to give evidence against himself in a criminal case." Md. Const., Declaration of Rights, Art. 22. Article 22, with its federal counterpart, the Fifth Amendment, provides a privilege against being compelled to be a witness against oneself. *Blum v. State*, 94 Md. 375, 382–83, 51 A. 26, 28 (1902); *Bass v. State*, 182 Md. 496, 500–01, 35 A.2d 155, 157 (1943); *Adams v. State*, 202 Md. 455, 460–63, 97 A.2d 281, 283 (1953), *rev'd on other grounds*, 347 U.S. 179, 74 S.Ct. 442, (1954); *Brown v. State*, 233 Md. 288, 292, 196 A.2d 614, 615 (1964); *State v. Panagoulis*, 253 Md. 699, 707, 253 A.2d 877, 881 (1969); *Hof v. State*, 337 Md. 581, 597, 655 A.2d 370, 378 (1995).

The Supreme Court held in *Miranda* that statements obtained from defendants during custodial interrogation or conditions that created similar circumstances, without the

16

full warning of constitutional rights, and waiver of those rights, were inadmissible as having been obtained in violation of the Fifth Amendment privilege against self-incrimination. 384 U.S. at 478–79, 86 S.Ct. at 1630. For *Miranda* warnings to be required, the defendant must be both in custody and subject to interrogation. Within the scope of *Miranda*, "interrogation" applies "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90 (1980) (internal footnotes omitted). These well-known *Miranda* warnings require an individual to be informed that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630. The warnings act as procedural safeguards against compelled self-incrimination. Once an individual is apprised of these warnings, the individual has the right to invoke the constitutional safeguards or waive them and engage with law enforcement. An invocation of the right to remain silent must be unequivocal and unambiguous for the police to terminate the interrogation. *Williams v. State*, 445 Md. 452, 470, 128 A.3d 30, 40 (2015). However, "[a]ny and all requests by the person being questioned to exercise his or her *Miranda* right to silence must be 'scrupulously honored' by police, and have the effect of 'cut[ting] off questioning.'" *Williams v. State*, 219 Md. App. 295, 316, 100 A.3d 1208, 1220 (2014), *aff'd*, 445 Md. 452, 128 A.3d 30 (2015) (quoting *Michigan v. Mosley*, 423 U.S. 96, 103,

17

96 S.Ct. 321, 326 (1975)). *See also Davis v. United States*, 512 U.S. 452, 458–59, 114 S.Ct. 2350, 2355 (1994) (holding that where an individual unambiguously invokes the right to remain silent, there must be immediate cessation of all questioning). If an individual invokes the right to remain silent, all questioning must cease. *Crosby*, 366 Md. at 528–29, 784 A.2d at 1108.

In the event that officers continue to question an individual, any evidence flowing therefrom is illegally obtained and thus subject to exclusion as fruit of the unlawful conduct. *Miles v. State*, 365 Md. 488, 521, 781 A.2d 787, 806 (2001). "The rule is calculated to prevent, not to repair[]" an erosion of constitutional rights by precluding the State from using illegally obtained evidence. *Brown v. Illinois*, 422 U.S. 590, 599–600, 95 S.Ct. 2254, 2260 (1975). "[T]he exclusionary rule is perhaps the most effective and practical means of curbing lawless police[.]" *Williams v. State*, 375 Md. 404, 419, 825 A.2d 1078, 1086 (2003) (internal citations omitted). The caveat to generally excluding statements in violation of *Miranda* allows the evidence to be used for impeachment purposes. *Miranda*, 384 U.S. at 477, 86 S.Ct. at 1629. *See Harris*, 401 U.S. at 226, 91 S. Ct. at 646 (holding that statements taken in violation of *Miranda* could be used to impeach Harris's inconsistent trial testimony); *Hass*, 420 U.S. at 722, 95 S.Ct. at 1221 (allowing information obtained after *Miranda* warnings were given to be used for impeachment purposes). Allowing statements elicited in violation of *Miranda* for impeachment purposes, but not as substantive evidence, strikes a "pragmatic balance between two competing public policies—the exclusionary rule precluding the use of confessions

18

obtained in violation of *Miranda*, on the one hand, and not giving defendants a free ride to commit perjury[.]"  *Wright v. State*, 349 Md. 334, 348, 708 A.2d 316, 323 (1998).

However,  the Supreme Court has made clear that statements elicited during police custody and interrogation are inadmissible if there is coercive police action similar to that in *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515 (1986) or *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246 (1991).  In *Connelly*, the Supreme Court determined that where the defendant confessed to a murder, but it was later revealed that he "was following 'the voice of God[,]'" the confession was involuntary.  479 U.S. at 161, 107 S.Ct. at 518. Likewise, the Court held in *Fulminante*, where the defendant confessed to an undercover agent in prison under the guise of receiving protection from prison violence, the confession was also coerced.  499 U.S. at 287, 111 S.Ct. at 1252.  Supreme Court precedent clearly dictates that statements taken in violation of *Miranda* can be used to impeach an individual's trial testimony, so long as the statements were elicited voluntarily.

An individual's post-arrest silence is also protected by *Miranda* and generally cannot be admitted as substantive evidence at trial.  The Supreme Court articulated this concept in *Doyle v. Ohio*, 426 U.S. 610, 617–18, 96 S.Ct. 2240, 2244–45 (1976), opining that following receipt of *Miranda* warnings, "post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested."  In *Doyle*, the Supreme Court explored the obstacles that post-arrest silence can pose.  Primarily, when an individual is silent following an arrest, it is ambiguous to the finder of fact whether the silence is a result of acquiescence or disagreement to questioning.  "Failure to contest an

19

assertion, however, is considered evidence of acquiescence only if it would have been natural under the circumstances to object to the assertion in question." *United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 2136 (1975). Notwithstanding an accusation or assertion, in the face of contemporaneous statements, *Miranda* warnings carry an implicit assurance that silence will not be penalized. *Doyle*, 426 U.S. at 618, 96 S.Ct. at 2245. Otherwise, the introduction of an individual's invocation of the constitutional right to silence, "would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* However, "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182 (1980) (per curiam).

Supreme Court precedent on post-*Miranda* silence "does not force any state court to allow impeachment[.] *Jenkins v. Anderson*, 447 U.S. 231, 240, 100 S.Ct. 2124, 2130 (1980). The principles enunciated by the Supreme Court should be regarded as the minimum of constitutionally afforded protections, where each State may expand *Miranda's* constitutional rights as it deems fit. With the tenets of *Miranda* and its progeny, we now assess whether Reynolds's statements after invoking *Miranda* should be subject to the exclusionary rule.

*Post-Arrest Silence: Permissible Uses of Inconsistent Statements for Impeachment*

*Purposes*

Case law developed in Maryland and in the United States Supreme Court following *Miranda* requires us to address the timeline of the statements elicited by detectives when Reynolds invoked the right to remain silent. Undisputedly, the April 14 interview constituted a custodial interrogation by the detectives, thus prompting the need for *Miranda* warnings. At issue is whether Reynolds's indication that he desired to remain silent was sufficient to invoke *Miranda*'s protections. Although disputed by the State, the suppression court found that statements elicited after Reynolds indicated that there was "nothing I have to say[,]" were taken in violation of *Miranda*. The Court of Special Appeals concurred that although Reynolds's statements were made voluntarily, the continued questioning violated *Miranda*. *Reynolds*, 2017 WL 5171593, at *8. The detectives violated *Miranda* by continuing to question Reynolds after multiple indications that he desired to cease the interrogation. The detectives elicited statements related to his location on the night of King's murder and the identity of persons who could have potentially verified his whereabouts. Detective Colbert asked Reynolds which country he was in during November of 2002, to which Reynolds responded that he was in the Virgin Islands. Reynolds also told detectives about two individuals, Byron Matamora and Rose Lopez, who were affiliated with Reynolds at the time. Where the suppression court rendered a reasonable factual determination that Reynolds's declarative statement was sufficient to invoke his right to remain silent, we decline to disturb that finding.

21

At trial, Reynolds testified on direct examination that he was actually in New York on the night of King's murder and that two witnesses, Caroline George and Karlene Gill, could serve as his alibi. On cross-examination, the State inquired "[s]o, instead of telling the police about Caroline George, or Karlene Gill, who could truly alibi you, you started naming Rose Lopez and Byron Matamora, who isn't even a real person?" Reynolds's objection to this question was overruled. The State continued, "just so we're clear, you never said anything about Caroline George or Karlene Gill?" Reynolds's counsel again objected, approached the bench, and moved for a mistrial, which was ultimately denied. Reynolds asserts that he omitted information about his alibi from police officers because he was exercising his right to remain silent pursuant to *Miranda*, and that the trial court's admission of his post-*Miranda* silence, was an impermissible infringement of Reynolds's right to due process.

Reynolds argues that Maryland liberally construes the right to be free from compulsory self-incrimination, and thus, this Court should evaluate Reynolds's claim through the lens of post-arrest, post-*Miranda* silence. At issue is whether Reynolds's failure to apprise officers of the alibi he introduced during trial constituted silence. We have examined silence introduced against a criminal defendant on multiple occasions. Before this Court and the Court of Special Appeals, Reynolds relied on our decision in *Grier*, where we concluded that "[e]vidence of post-arrest silence, after *Miranda* warnings are given, is inadmissible for any purpose, including impeachment." *Grier v. State*, 351 Md. 241, 258, 718 A.2d 211, 219 (1998) (citing *Doyle*, 426 U.S. at 619, 96 S.Ct. at 2245

22

(1976)). The petitioner in *Grier* was arrested for forcibly stealing another's backpack and was charged with attempted robbery with a deadly weapon, in violation of Article 27, § 488 of the Maryland Code (1957, 1996 Repl. Vol., 1997 Supp.); statutory maiming, in violation of Article 27, § 3851 of the Maryland Code (1957, 1992 Repl. Vol.); and other related offenses. *Grier*, 351 Md. at 245, 718 A.2d at 213. During the direct examination of the arresting officer, the State inquired about whether Grier offered any explanation for the crime prior to the arrest, to which the arresting officer indicated that Grier did not. *Id.* at 248, 718 A.2d at 215. We rejected the State's proposition that a defendant's failure to come forward and tell the police his version of events was admissible as substantive evidence of guilt on the grounds that such silence was not probative. *Id.* at 255, 718 A.2d at 218. The Court rationalized that failure to speak up in the presence of police could be a result of numerous factors, thus, the evidence of post-arrest silence is more prejudicial than probative and generally should not be admitted. *Id.* at 254–55, 718 A.2d at 218.

We reiterated the principle again in reference to post-*Miranda* silence in *Kosh v. State*, 382 Md. 218, 227, 854 A.2d 1259, 1265 (2004) (explaining "silence is evidence of dubious value that is usually inadmissible under either Maryland Rule 5-402 or 5-403[]") (footnote omitted); *Lupfer v. State*, 420 Md. 111, 132, 21 A.3d 1080, 1092 (2011) (reasoning "[e]vidence of post-arrest silence, after *Miranda* warnings are given, is inadmissible[]") (internal citations and quotations omitted); *Coleman v. State*, 434 Md. 320, 346, 75 A.3d 916, 931 (2013) (reversing a criminal conviction when trial counsel failed to object because "Coleman's post-*Miranda* silence 'so upset the adversarial balance

23

between defense and prosecution that the trial was unfair and the verdict rendered suspect.'"). *Cf. Younie v. State*, 272 Md. 233, 244, 322 A.2d 211, 217 (1974) (concluding "[s]ilence in the context of a custodial inquisition is presumed to be an exercise of the privilege against self-incrimination from which no legal penalty can flow[.]"). The Supreme Court and our precedent is clear, evidence of a criminal defendant's post-*Miranda* silence cannot be introduced at trial.

However, Reynolds asserts that making statements to the police, invoking the right to remain silent, testifying at trial, and having his silence used against him for impeachment purposes, is a matter of first impression for this Court. Reynolds argues that this scenario is factually distinguishable from our other decisions analyzing post-arrest, post-*Miranda* silence, and encourages this Court to follow the analysis in *United States v. Caruto*, 532 F.3d 822 (9th Cir. 2008). In *Caruto*, the United States Court of Appeals for the Ninth Circuit held that cross-examination on the discrepancies between post-*Miranda* omissions and in-trial testimony is impermissible because it engenders meaning from constitutionally protected silence. *Id.* at 831. Caruto was arrested with seventy-five pounds of cocaine in her vehicle. *Id.* at 824. Caruto was advised of her *Miranda* rights and agreed to make a statement. *Id.* However, five to seven minutes into the interview, she invoked her right to counsel, thereby cutting her statement short. *Id.* at 824. All questioning ceased, and Caruto made no other statements. *Id.* Portions of her statement were memorialized as handwritten notes taken by one of the interrogating officers. *Id.*

24

At trial, the interrogating officer was asked, "[w]hat did she tell you about the truck?" *Id.* The officer explained that Caruto lent the vehicle to her friends in Mexico three to four weeks prior, and the vehicle was returned on the same day she drove to Los Angeles. *Id.* Caruto testified inconsistently with the officers' testimony that her friend, Jimenez, was interested in purchasing the truck, and asked to take it to a mechanic to "try it[,]" and upon returning from the mechanic Jimenez offered to buy it. *Id.* at 825. Jimenez was to pay her $1,000 immediately and $1,000 once Caruto drove the truck to Los Angeles. *Id.* During closing arguments the prosecutor argued that Caruto did not tell the agents that she lent the truck to Jimenez, did not tell the agents that Jimenez gave her the truck, did not provide the agents with Jimenez's phone number, and did not tell the agents she was selling the truck. *Id.* at 826. Relying on *Doyle*, the *Caruto* Court held that where "it is a defendant's invocation of her *Miranda* rights that results in the omitted facts that create the difference between the two descriptions, cross-examination based on those omissions draws meaning from the defendant's protected silence in a manner not permitted by *Doyle*." *Id.* at 831. Factually distinguishable from *Caruto*, *inter alia*, is that the prosecution argued that Caruto failed to give officers pertinent information, unlike here where Reynolds told the officers facts that were inconsistent with his trial testimony. Missing from Reynolds's reliance on *Caruto* is a recognition of the distinction between silence and using affirmative inconsistent statements for impeachment.

The *Caruto* Court also considered the Supreme Court's rationale in *Anderson v. Charles,* 447 U.S. at 404, 100 S.Ct. 2180. Charles, the defendant, was arrested while

25

driving a stolen car, and charged with murdering the vehicle's owner. *Id.* Charles was given *Miranda* warnings and then asked about the stolen vehicle. *Id.* at 405, 100 S.Ct. 2180. Charles told the police that he stole the car in Ann Arbor, Michigan, two miles from a bus station. *Id.* At trial, the arresting officer testified to the same facts Charles conveyed during the interrogation. *Id.* Later, Charles took the stand and testified that he took the vehicle from a parking lot next to the bus station, inconsistent with his statement that he took it from two miles away from the bus station. *Id.* On cross-examination, the State asked Charles, "[d]on't you think it's rather odd that if it were the truth that you didn't come forward and tell anybody at the time you were arrested, where you got that car?" *Id.* at 406, 100 S.Ct. 2181. In light of *Doyle*, the Court reasoned that the State's cross-examination was proper because "[s]uch questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." In the case at bar, Reynolds similarly testified inconsistently about the underlying subject of whom he saw on the night of King's murder. Like the questions posed towards Charles "were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement[,]" the questions regarding Reynolds's alibi were not pointed at highlighting his omissions from law enforcement. *Id.* at 409, 100 S.Ct. at 2182. Rather, the State's questions referred to Reynolds's prior inconsistent statements.

Consistent with the Supreme Court's determination in *Harris* and *Hass*, a defendant's voluntary and trustworthy statements obtained in violation of *Miranda* that are

26

inconsistent with the defendant's direct examination testimony, can be used for impeachment. Reynolds argues that *Miranda* invoked silence cannot be used against a defendant even for impeachment purposes. In contrast, the State avers that Reynolds did not simply omit his alibi testimony by opting to remain silent. Rather, his statements to detectives and testimony at trial were inconsistent, and accordingly, could be used by the State to impeach his credibility. In support of its argument, the State relies on United States Supreme Court precedent including *Harris*, 401 U.S. at 222, 91 S.Ct. at 643 and *Hass*, 420 U.S. at 714, 95 S.Ct. at 1215. Both *Hass* and *Harris* certainly stand for the proposition that an individual's post-*Miranda* statements can be used at trial for impeachment purposes.

Harris was charged in "a two-count indictment with twice selling heroin to an undercover police officer." *Harris*, 401 U.S. at 222-23, 91 S.Ct. at 644. Testifying in his own defense, Harris denied selling the undercover officer illegal drugs, and claimed that the substance sold to the undercover officer was baking powder. *Id.* On cross-examination, the State asked about statements he made immediately following his arrest that contradicted his direct testimony. *Id.* at 223, 91 S. Ct. at 644. Harris claimed that he could not remember any of his statements. *Id.* The Supreme Court held that Harris' voluntary statement, although procured in violation of *Miranda*, was properly used to impeach him when he testified inconsistently with his prior statement at trial. *Id.* at 226, 91 S.Ct. at 646.

Similarly, in *Hass*, the Court confirmed that the deterrence factor provided by the exclusionary rule is sufficiently maintained "when the evidence in question is made unavailable to the prosecution in its case in chief." 420 U.S. at 722, 95 S.Ct. at 1221. Hass

27

was involved in the theft of two bicycles. *Id.* at 715, 95 S.Ct. at 1217. After Hass was apprehended and placed under arrest, officers gave Hass the prescribed *Miranda* warnings. *Id.* Hass immediately admitted to taking the bicycles, but once placed in a patrol car he indicated he wanted to contact his attorney. *Id.* Hass then pointed out where one of the stolen bicycles was hidden in a nearby bush. *Id.* at 716, 95 S.Ct. at 1218. Hass testified at trial that he did not know the bicycle was stolen. *Id.* As a rebuttal witness, the State called the arresting officer who testified that Hass told officers where the bikes were stolen. *Id.* at 717, 95 S.Ct. at 1218. Applying *Harris*, the Court reiterated that a reading of *Miranda* does not require that evidence inadmissible against Hass in the prosecution's case-in-chief be barred for all purposes, always provided that "the trustworthiness of the evidence satisfies legal standards." *Id.* at 722, 95 S.Ct. at 1221 (internal citations and quotations omitted). "[T]he impeaching material would provide valuable aid to the jury in assessing the defendant's credibility; again, 'the benefits of this process should not be lost[.]'" *Id.*

Reynolds argues that despite the lengthy precedent built around *Harris* and *Hass*, these principles should not apply. Reynolds argues that *Harris* is distinguishable because *Harris* only considered the use of statements that the petitioner in *Harris* actually made to the police, not silence. Indeed, silence was not at issue in *Harris*. However, despite Reynolds's contention, the issue before this Court is not one of custodial silence. To the contrary, Reynolds provided detectives details about his personal life, which ran contrary to his trial testimony. These affirmative statements were then used for "classic impeachment" purposes. *Reynolds*, 2017 WL 5171593, at *11. For that reason, the

underlying application of a prior inconsistent statement in *Harris* is equally employable here. Much like Harris who provided police officers distinctly inconsistent statements from his trial testimony, Reynolds told the detectives that he was in the Virgin Islands at the time of King's murder. At trial, he testified that he was in New York. The identities of his two alibi witnesses who were also in New York, were necessarily related to the inconsistent statements about where he was on the night of the murder. The holding from *Harris*, that prior inconsistent statements that would otherwise be *Miranda* violative statements can be used to impeach a witness's in court testimony, is on par with the factual circumstances in this case.

For the same reasons Reynolds's claim that *Harris* is incongruous to the facts of this case fails, his criticisms of *Hass* should also fail. Reynolds argues that *Hass* is incongruous because Hass, like Harris, was impeached by what he told the police, not by what he failed to tell the police. Reynolds also asserts that Hass's testimony directly contradicted testimony that he told police, and alludes that Reynolds, somehow, did not. As Reynolds properly identifies, the *Hass* Court relied directly on *Harris*, which we follow here. Additionally, Reynolds's statements to the detectives about his whereabouts on the night of King's murder are directly inconsistent with the testimony he gave at trial. *Miranda's* premise as reiterated in both *Hass* and *Harris*, allows prior inconsistent statements to be used directly for impeachment purposes. Therefore, it was not error for the State to inquire on cross-examination about the inconsistent statements Reynolds made to police officers after he invoked *Miranda*.

29

**CONCLUSION**

We conclude that it was not error for the trial court to permit the State to inquire about prior inconsistent statements made to detectives after Reynolds invoked *Miranda*. The State's use of Reynolds's prior inconsistent statements about what he did not tell the State were not post-arrest silence, but rather affirmative statements about his alibi. In accordance with *Miranda* and its progeny, it was appropriate for the State to impeach Reynolds about this testimony on cross-examination.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**